141 T.C. No. 9

UNITED STATES TAX COURT

ADVO, INC. & SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17247-10.                    Filed October 24, 2013.


R disallowed a deduction P claimed under I.R.C. sec. 199 of $1,515,992 for the 2006 tax year and $151,047 for the short 2007 tax year. R determined that P was not considered to have manufactured, produced, grown, or extracted qualifying production property under I.R.C. sec. 199 with respect to P's direct advertising mailings.

Held: P did not have the benefits and burdens of ownership of the direct advertising materials and is not entitled to the I.R.C. sec. 199 deduction.

Michael P. Walutes, Craig A. Raabe, John R. Shaugnessy, Jr., Gary D.
Yeats, and Scott E. Sebastian, for petitioner.*

Donald K. Rogers, Charles E. Buxbaum, and William T. Derick, for
respondent.

WHERRY, Judge:  This case is before the Court on a petition for
redetermination of deficiencies in income tax respondent determined for
petitioner's 2006 tax year and short 2007 tax year.

The only issue for decision in this Opinion in this bifurcated case is whether
petitioner is entitled to a section 199[1] deduction for manufactured, produced,
grown, or extracted qualifying production property with respect to petitioner's
direct advertising mailings.[2]

---

*Brief amici curiae was filed by Mario J. Verdolini and Ethan R. Goldman,
as attorneys for Limited Brands, Inc., and Judith A. Mather, as attorney for
Meredith Corp.

[1]Unless otherwise indicated, all section references are to the Internal
Revenue Code of 1986 (Code), as amended and in effect for the taxable years at
issue, and all Rule references are to the Tax Court Rule of Practice and Procedure.

[2]There remains a second issue for resolution, in a separate trial, whether
ADVO is entitled to a credit pursuant to sec. 41 for increasing research activities
in connection with the development of internal use software.

- 3 -

FINDINGS OF FACT

The parties' stipulation of facts, with accompanying exhibits, and the stipulations of settled issues are incorporated herein by this reference. At the time petitioner filed the petition, its principal place of business was in Connecticut.

Petitioner, ADVO, Inc. (ADVO), was the common parent of the consolidated group ADVO, Inc., & Subsidiaries for the tax years ending September 24, 2005, and September 30, 2006, and for the short taxable year ending March 2, 2007. On March 3, 2007, ADVO was acquired by Valassis Communications, Inc., and continues to exist as its wholly owned subsidiary.

During 2005, 2006, and 2007, ADVO distributed direct mail advertising in the United States. Direct mail advertisers such as ADVO distribute advertising material through the U.S. Postal Service (USPS) to residential recipients, who are the targeted potential customers for the products and services sold by ADVO's clients, the advertisers. The advertising material can be either "solo direct mail" or "cooperative direct mail". For solo direct mail, the printed advertising material of a single advertiser is delivered in a stand-alone envelope or as a postcard to a residential recipient. For cooperative direct mail, also known as a shared mail package, the printed advertising material for several different advertisers is consolidated into a single delivery mechanism (such as an envelope or sleeve) and

delivered as a single unit to residential recipients. This allows ADVO's clients to share the advertisements' costs of mailing and postage to reach the target consumers' mailboxes.

ADVO's clients are typically businesses whose products and services are used by the general population or specific subgroups thereof. These businesses include supermarkets, quick-serve restaurants, drug stores, discount and department stores, home furnishing stores, and other retailers. Print advertising companies, such as newspapers, regional and local mailers, direct marketing firms, so-called shoppers and pennysavers, in the same type of business as ADVO, compete primarily on the ability to effectively target the delivery of the client's advertisement to the consumer households with the highest propensity to purchase the product being advertised on a cost-effective basis. The companies also compete on the extent to which they provide coverage, the reliability of delivery, and most importantly the ability to provide a satisfactory return on the advertiser's investment.

Either ADVO's clients supply the advertising material for ADVO to distribute (client-supplied material) or ADVO supplies the materials for distribution (ADVO-supplied material). When ADVO supplied the advertising material, ADVO contracted with third-party commercial printers to print it. The

section 199 deductions at issue were attributable to direct mail advertising involving only the ADVO-supplied material.

ADVO's shared mail packages were distributed weekly, and each included a "wrap" and various "inserts". A detached address label (DAL), also known as a missing child card, was also associated with each shared mail package. The DAL was a card with the address of the consumer recipient and a missing child's information printed on one side and an advertisement printed on the other side. During the years at issue the wrap was a branded turnkey product known as "Shopwise". The Shopwise wrap was printed on both sides of a single sheet of paper and folded in half, and then multiple inserts were loosely inserted into the wrap to form the shared mail package, all in accordance with specifications defined by ADVO. An insert was a printed advertising piece for a single advertiser.

ADVO marketed the Shopwise wrap to potential customers by selling "page positions" on the wrap, including Billboard, Inside Page, and Outside Page, as well as multipage options; each wrap could accommodate advertising for one or more customers. ADVO sold the Shopwise wrap across hundreds of wrap zones nationally, and each wrap zone could have a different Shopwise wrap with

different advertisers. There were approximately 580 wrap zones, and each one was composed of a cluster of ZIP Codes.

ADVO developed and marketed a portfolio of ADVO-supplied inserts, each of which was differentiated by a set of defined product specifications, which included paper dimensions, paper weight, and bleed availability. An ADVO client could choose to advertise on both sides of a single page insert or on an insert consisting of multiple pages. ADVO sold ADVO-supplied inserts for distribution via both ZIP Codes and "ADVO Targeting Zones" (ATZ). An ATZ is a cluster of consumers, located on specific mail delivery routes, averaging approximately 3,500 households and is smaller than a wrap zone to allow for finer targeting of marketing materials to potential consumers. ATZs were proprietary configurations of households developed by ADVO which took into account demographic and psychographic information and could target the potential buying habits of the target consumers.[3] ADVO had about 133 million mailing addresses in its system.

ADVO classified its ADVO-supplied material as either "turnkey" or "custom". A turnkey product was a print product that was included in ADVO's

---

[3]Psychographics is the study of personality, values, attitudes, interests, and lifestyles.

portfolio of products that met specifications defined by ADVO. A lump sum which included the advertising services, printing, and distribution was billed to the client for turnkey products.[4] The pricing for turnkey products was one rate for the entire process: creating the advertisement, producing the advertisement, delivering the advertisement, and targeting the desired end consumers. ADVO handled everything from the design of the advertisement through distribution of the turnkey product, and specifications were designed to facilitate cost-efficient assembly and distribution of the shared mail packages. The DAL, Shopwise wrap, and ADVO-supplied inserts were turnkey products.

A custom print product was an insert that was not part of ADVO's portfolio of turnkey products because of the client's specifications for the insert. ADVO billed two separate charges for custom inserts: one for the printing and one for the advertising and distribution.

We discuss infra the general process for ADVO's products. Much of the trial was dedicated to the minutest details of the process, and we by no means list every single step. Our intention is not to discount those important and necessary

---

[4]With respect to turnkey products, ADVO's calculation of "domestic production gross receipts" for the purposes of sec. 199 included all receipts derived from ADVO's lump-sum charge.

steps not mentioned but to give merely a general idea of how the cooperative mailings were produced.

The Sales Process

During the years at issue ADVO employed around 600 sales executives. The sales force was responsible for selling advertising space in the shared mail package. ADVO distributed 60 to 80 million packages every week of the year.

The Design Process

In varying degrees, ADVO's graphic print department assisted ADVO's clients with the design of the advertisement graphics. The graphic design requirements with respect to ADVO-supplied materials generally fell into three categories: "rough art", "reprint with changes", and "client-supplied art". Rough art made up 45% to 50% of the graphic art work designed by ADVO and it was anything from a sketch on the back of a napkin to an advertisement created from a client's general concept for a product or service the client wanted to advertise. Reprint with changes made up 30% to 35% of the graphic art work designed by ADVO and involved circumstances where a previously developed graphic design was reused after ADVO made changes, such as to the coupon expiration dates or as required for a different holiday promotion. In these two situations, ADVO retained ownership of all intellectual property associated with the artwork and

advertisement.[5] Client-supplied art made up the final 15% to 20% of the graphic work. When ADVO's clients supplied the art, the client retained the ownership of intellectual property related to that art. Client-supplied art still required ADVO's artwork department to analyze and normalize the files in order to make sure that they were printable. ADVO produced between 106,000 and 107,000 graphic designs per year.

ADVO employed 40 to 45 graphic print coordinators whose role was to coordinate among ADVO's sales organization, ADVO's graphics personnel working on a design, and the third-party printers. The graphic print coordinators understood the graphic art applications used to create graphic designs, the development of four-color photography as supported by the CMYK[6] printing, and the printing process itself, to ensure the best printable product according to the functional capabilities of the specific printing press. ADVO employed 50 to 60

---

[5]A sample example of one of ADVO's invoices to one of its clients states "We retain the copyright to all artwork and other materials that we create for you." Further, ADVO states on brief that "[t]he Petitioner's third-party printers do not transfer title to the printing plates" and that "Petitioner's interest in the graphic design and related PDF-X1a file does not pass to the Petitioner's clients".

[6]The printer usually uses four printing plates, one for each of the three subtractive primary colors (cyan, magenta, and yellow) and black. For this reason the process is sometimes referred to as the four-color printing process or CMYK printing. We take judicial notice that black is represented by "K" for key, because often black is the key printing plate, which is used to position the other colors.

desktop artists during the years at issue. The desktop artists were responsible for actually creating the advertisements using the graphic design applications on Macintosh computers. The desktop artists would also "pre-flight" all of the graphic designs before they were sent to the third-party printer. ADVO's purpose for the preflight process was to ensure that the image the desktop artist saw on the computer screen would accurately print. ADVO also employed 20 to 25 quality control artists who proofread the ads and reviewed the graphic design files to make sure that they met the printing specifications for the job.

After the desktop artist created an advertisement art file and it was reviewed by the quality control artist, a low-resolution PDF would be uploaded to the ADVO online graphics gallery for the client to view and approve the advertisements.[7] ADVO maintained a file of all the information for a client's advertising job in a "job jacket", which included the order and the art work. After the client approved the advertisement, it was released to the printer in an Adobe PDF X1A format. The printing process colors were already separated in the PDF sent to the printer.

---

[7]PDF is an acronym for portable document format. It is a computer file upon which graphics and other data or information can be stored and transferred.

## The Paper Supply

As discussed infra the printing machines used a continuous stream of paper which was pulled through the press from large rolls. ADVO's paper supply arrangement between its paper broker and its third-party printers was known in the paper and printing industries as a "directed buy" agreement. Pursuant to this agreement a broker, A.T. Clayton for the years at issue, sold paper ADVO prespecified to ADVO's third-party printers for use in fulfilling the printers' contracts with ADVO. The third-party printers ordered and purchased the paper directly from the broker, and the paper was shipped directly to the printers. ADVO's advertisements made it one of the top 20 print paper users in the United States, consuming approximately 90,000 tons of paper, purchased pursuant to ADVO's directed buy agreements, each year. The printers understood that, absent special specific authorization from ADVO, they were not allowed to use that paper for any of their clients but ADVO.

ADVO never took physical possession of the raw paper stock and did not pay for any paper until the print contract was completed and it received an invoice from the printer. ADVO did not guarantee payment to the broker in the event a printer defaulted on the purchase contract.

The Printing Process

ADVO spent approximately $125 million per year on its turnkey printing needs, $50 million of that for paper and $75 million of it for printing services. ADVO contracted with third-party printers to print the advertising material. For the years at issue, ADVO entered into printing agreements with various printers including: Quebecor World (USA), Inc.; Trend Offset Printing; Handbill Printers; ESP; Shared Mail Acquisitions, LLC (KAR); Windward Print Star, Inc., d.b.a. AdplexRhodes (Adplex); Inserts East; and American Color Graphics, Inc. The contracts each contained similar "Risk of Loss" sections, an example of which provides that

> Title to and risk of loss, damage to, and delay of the manufactured Products shall pass to ADVO upon delivery to ADVO's branch facility, F.O.B. ADVO's dock. All mechanicals, paper, film, plates, etc., not supplied by ADVO or its clients but used to perform the services hereunder shall remain the exclusive property of * * * [printer] unless otherwise agreed in writing.

The third-party printers were required to maintain insurance with respect to all of ADVO's work in progress and all materials. Insurance limits did not limit the printer's liability to ADVO, and ADVO was not responsible for the deductible. All of the policies were to extend coverage to ADVO as loss payee.

The third-party printers that ADVO contracted with to print the advertising material it created for its clients used a process known as Web offset lithography. During this process a continuous stream of paper is pulled through the press from rolls of paper which can weigh more than one ton each. The process is known as offset printing because the printing plates do not actually touch the paper; instead, the plates transfer ink to rubber blankets (rollers) that, in turn, transfer the image to the paper.

Upon receipt of the electronic file, the printer preflighted the file, typically using computer software. After the preflight process, the printer determined whether the client's graphic design could be "ganged" together or combined with the client's other graphic designs. Ganging involves the arrangement of the advertisements of multiple advertisers for placement on the set of printer plates used with respect to a single press run. When ganging is feasible, the printer then typically uses the electronic file in the computer for creation of the press run printing plates. ADVO prohibited its third-party printers from ganging jobs for the printer's other clients on the same press run used for ADVO's products.

After the printer verifies that the imposition has been done correctly, the printer makes the printing plates. The plates are typically made using a computer-to-plate exposure unit which uses an infrared laser to expose or impart the image

onto the plate. Once the plates are exposed, the printer then runs the plate through an automatic processor for development and a water-attracting finisher and preservative is applied. The printer generally makes four printing plates, one for each of the three primary colors, cyan, magenta, and yellow, and one for black. Additional ink colors, if any, are commonly referred to as "spat colors" and may necessitate another printing plate and/or a fifth inkwell. The printer performs these tasks with little or no direct operational control from ADVO.

The printer inspects the plates for and corrects any defects. When no defects are found or none remain, the printer uses a machine to bend each plate to conform to the plate cylinder on which it will be clamped. The bending machine uses anvils to bend the plates into the shape required to fit on the plate cylinder. The press operator then mounts each plate on a cylinder in a separate printing unit or tower for each of the colors and loads the paper onto the press.

The press operator starts the press and makes adjustments to bring the press up to the proper color. During this process, the press operator compares print samples with a proof and adjusts the color using ink keys which control the thickness of the ink applied to each portion of the plate. The color information contained in ADVO's PDF files, received by the printer, provide instructions to the press that automatically set the ink keys near where they are needed to bring

the press run initially up to color. Again the printer executes these manufacturing and/or production steps with little active direct involvement by ADVO. ADVO creates hundreds of graphic designs every day and millions of mailers every week. ADVO's Pittsburgh facility alone processed between 35 and 50 million wraps, inserts, and DALS every week. Each wrap is comprised of numerous pages. Given this taxing weekly production cycle, the number of items involved and the geographic scope of its activities, ADVO's close day-to-day supervision of the massive printing operation is not achieved or practically feasible.

ADVO required its third-party printers to achieve a "pleasing color" standard with respect to its turnkey orders, and it required its clients to accept the standard for their order. The pleasing color standard required that pictures look pleasing to the eye, i.e. that food looked appetizing without a green cast and flesh tones look natural, not too red or yellow, and smooth. If a client was unwilling to accept the pleasing color standard, it could purchase a custom print product with a higher "exacting color" standard. The pleasing color standard facilitated the ganging of ADVO's products by minimizing in-line color conflicts.

During the print run, the printer must also check the registration of the plates. Registration is the alignment of the printing plates as they apply their respective colors to the portion of the image being printed; if the plates are not

properly lined up, the image will not be in focus and the color may be incorrect. Once the press operator was confident that the color and registration were correct, then the press speed was increased and the run was completed. Periodically during the run, the printer would examine samples of the printed product for quality review. After the press run, depending on the finishing requirements for the job, the printer cut and/or folded the individual print product into shippable packages and then shipped the product to ADVO designated location(s).

The Package Assembly

ADVO had 17 shared mail processing facilities around the country where the shared mail packages were assembled. The facilities ranged in size, depending on the size of the market served by the facility. A middle-size facility, such as the one in Pittsburgh, Pennsylvania, comprised about 138,000 square feet and employed around 150 associates and 80 temporary associates, the number of which would fluctuate according to the season and workload. During the years at issue ADVO's processing facilities used large pieces of Muller Martini manufactured equipment known as Muller 227s and Alphaliners. These were used to group the wraps and inserts into shared mailed packages. These machines, with a cost for new Alphaliners exceeding $1,150,000, have a series of hoppers in which wraps or inserts are placed; then the machine collates the wraps and inserts

into a shared mail package. Each machine requires a number of people with each person maintaining inserts for three or four hoppers. Optimally the Muller 227 could process about 7,000 packages per hour and the Alphaliner could process about 15,000 packages per hour.

ADVO spent $25 million a year transporting materials to the USPS. ADVO spent approximately $500 million in postage per year during the years at issue. Because ADVO wanted to achieve the largest possible discount from the USPS, it limited the amount of handling required by the USPS in delivering ADVO's packages. To that end, ADVO prepared the DALs in the delivery route walk sequence of each postal carrier, which enabled that postal carrier to deliver ADVO's shared mail packages in the sequence of the residences as they appeared on the carrier's route. The postal carrier would have a stack of ADVO's shared mail packages and an ordered stack of the DAL cards; at each address he would pull the DAL card and associate it with a shared mail package for delivery.

Expert Report--C. Clint Bolte

ADVO engaged C. Clint Bolte to describe the customary working relationship between print buyers and printers, the six steps that are generally performed for commercial printing, and his analyses of the "benefits and burdens"

of ADVO's printing process.[8]  Mr. Bolte has a bachelor of industrial engineering

degree from the Georgia Institute of Technology and a master of business

administration degree from the Colgate Darden Graduate School of Business

Administration at the University of Virginia.  He has been a print consultant to the

printing industry since 1984, working with commercial printing organizations

regarding technology, best practices of the business, trade customs, and

---

[8]At trial respondent objected to this report as well as the rebuttal report also written by Mr. Bolte discussed infra.  Respondent argues that the reports do not assist the trier of fact and constitute legal arguments.  As such, they constitute arguments that require the Court to address its gate-keeper function and determine the proper weight to be accorded to the conclusions of the Bolte reports.  See generally Barabin v. Asten-Johnson, Inc., 700 F.3d 428, 431 (9th Cir. 2012); Esgar Corp. v. Commissioner, T.C. Memo. 2012-35, slip op. at 30-32 (citing Daubert v. Merrell Bow Pharms., Inc., 509 U.S. 579, 591, 597 (1993), Fed. R. Evid. 702 and 703, and Kumho Tire Co. v. Carmichael, 526 U.S. 137, 148, 152 (1949)), appeal filed (10th Cir. Sept. 6, 2012).

Mr. Bolte's testimony explained that the report represented his own "findings, my opinions concerning the elements, facts of this case relative to the printing industry  norm and relative to ADVO's production process from graphic design all the way through."  We find his testimony credible and overrule respondent's objection.

The Court evaluates expert opinions in the light of each expert's demonstrated qualifications and all other evidence in the record.  See Parker v. Commissioner, 86 T.C. 547, 561 (1986).  We are not bound by an expert's opinions and may accept or reject an expert opinion in full or in part in the exercise of sound judgment.  See Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938); Parker v. Commissioner, 86 T.C. at 561-562.

manufacturing management audits, as well as serving as an expert witness for commercial printing matters.

Mr. Bolte concluded that

ADVO exercised a comprehensive and unique level of control over the entire production of their printed direct mail products. As a result of their comprehensive policies and processes, ADVO exercised an uncommon level of control even over that portion of the process during which a third party printer fulfilled its assigned role of printing the direct mail piece in accordance with ADVO's detailed specifications.

Expert Report--Raymond J. Prince

Respondent engaged Raymond J. Prince to opine on the printing practices involved in the production of direct mail advertising during the years at issue and used by the printers ADVO contracted with. Mr. Prince has an associate of applied science degree and a bachelor of science degree in printing management from the Rochester Institute of Technology and a master of science degree in printing management from South Dakota State University. He has worked in the printing industry for the past 53 years serving clients in the public and private sectors.

Mr. Prince's report gives a statistical overview of the printing industry, provides a brief summary of the direct mail advertising business, and describes the four phases of the direct mail advertising business. The report then focuses on

printers, generally including their production, financial, and operational responsibilities. The report ends with a listing of ways printers can increase profitability.

Rebuttal Report--Clint Bolte

ADVO also engaged Mr. Bolte to write a rebuttal report to Mr. Prince's report. Mr. Bolte criticized Mr. Prince's report because it failed to recognize ADVO's niche in the direct mailer market and ignored the unique traits of ADVO's business model. He emphasized the job-specific and individualized, as compared to the generic, work done by ADVO and the broader scope of service and production supervision and control of all aspects of the work. He explained that

> The cradle-to-grave nature of ADVO's highly standardized shared mail product as compared to the generic "direct mail circular," as referenced but not even described by Mr. Prince, was a vitally important point that is missing in his report. Mr. Prince's report is of little value to the Court's analysis because it ignores the industry reality that a direct mailer (like ADVO) who supplies the printed product as part of a direct mail contract MUST successfully deliver the printed product to the mailbox of the intended recipient or the direct mailer has not supplied the printed product purchased by its client. * * *

According to Mr. Bolte's rebuttal report, ADVO's comprehensive policies and processes allowed it to exercise an uncommon level of control even over the

process during which a third-party printer fulfilled its assigned role of printing the direct mail piece in accordance with ADVO's detailed specifications.

Rebuttal Report--Raymond J. Prince

Respondent's expert, Mr. Prince, also prepared a rebuttal report. He focused on ADVO's factual claims regarding the uniqueness of their product and integrated delivery and targeted marketing service. He contrasted ADVO's product to that of other print producers and found, in his opinion, few, if any, truly unique qualities. He concluded that ADVO interacted with its printers in a manner not dissimilar to those of many print customers and consumers. In short, Mr. Prince concluded that the printing was done by the printers who produced the tangible personal property product, using ADVO or ADVO customer supplied pre-press intangibles, and not by ADVO.

Brief Amici Curiae of Limited Brands, Inc., and Meredith Corp.

On October 9, 2012, the Court granted Limited Brands, Inc., and Meredith Corp.'s motion for leave to file a brief as amici curiae and filed the brief. In the brief, the amici curiae express support for the examples set forth in section 1.199-3(f)(4), Income Tax Regs., discuss the application of the section 263A benefits and burdens test, argue for the application of Suzy's Zoo v. Commissioner, 114 T.C. 1 (2000), aff'd, 273 F.3d 875 (9th Cir. 2001), in this case, and dispute

respondent's application of the factors set forth in <u>Grodt & McKay Realty, Inc., v. Commissioner</u>, 77 T.C. 1221 (1981). Respondent submitted a reply brief to the brief of the amici curiae, and ADVO submitted a reply brief to respondent's reply.

OPINION

I.     <u>Introduction to Section 199</u>

Section 199, enacted as part of the American Jobs Creations Act of 2004 (AJCA), Pub. L. No. 108-357, sec. 102(a), 118 at Stat. 1424, is in effect for tax years beginning after December 31, 2004. Section 199, commonly referred to as the "Domestic Production Deduction", allows a taxpayer to deduct, subject to a limitation based on "wages paid", a specified percentage of the lesser of either (1) its "qualified production activities income" or (2) taxable income. Sec. 199(a) and (b). Section 199 was intended to stimulate job creation in the United States and strengthen the economy. <u>See</u> <u>Gibson & Assocs., Inc. v. Commissioner</u>, 136 T.C. 195, 223 (2011) ("The name of the AJCA and the statute's wage limitation on the amount of the deduction under section 199(a) indicate that Congress intended that section 199 create jobs in the United States and otherwise strengthen the U.S. economy."). The 2005 Blue Book from the Joint Committee on Taxation explained that "The Congress was of the view that a reduced tax burden on domestic manufacturers will improve the cash flow of domestic manufacturers and

make investments in domestic manufacturing facilities more attractive. Such

investment will assist in the creation and preservation of U.S. manufacturing

jobs." Staff of Comm. on Taxation, General Explanation of Tax Legislation

Enacted in the 108th Congress 170 (J. Comm. Print 2005).

For the years at issue, section 199(a) allows a taxpayer to deduct an amount

equal to 3% of the taxpayer's qualified production activities income for the year.[9]

The amount of the deduction cannot exceed 3% of the taxpayer's taxable income

for the year and is also limited to 50% of the "W-2 wages of the taxpayer for the

taxable year." Sec. 199(a) and (b). For the purposes of this section, "qualified

production activities income" means the excess, if any, of the taxpayer's domestic

production gross receipts (DPGR) over the cost of goods sold and other expenses

properly allocable to such gross receipts. Sec. 199(c)(1). We discuss the concept

of DPGR in more detail infra.

ADVO contends that its gross receipts attributable to its printed direct mail

advertising and distribution products qualify as "domestic production gross

receipts". Respondent counters that because ADVO contracted its actual printing

out to third-party printers it did not manufacture any qualifying production

---

[9]Both of the years at issue began before the phase-in increased the amount of the deduction. See sec. 199(a)(2).

property. In order for the gross receipts ADVO received from the sale of its advertising mail packages to qualify as DPGR, the mail package must be determined to be qualified production property, manufactured in the United States by ADVO. Therefore the critical issue in this case is whether ADVO manufactured the advertising mailing packages or produced only intangible property used by printers to produce tangible personal property in the form of the advertising mail packages.[10] The broad issue confronted here is how section 199

_____

[10] As an initial matter the Court notes that at a minimum the original ADVO electronic file for each print job constitutes qualifying production property as defined in sec. 199(c)(5)(A) or (B) as either computer software or tangible personal property manufactured and/or produced by ADVO. Courts have frequently reached conflicting results in their classification of electronic files, software, etc., as tangible or intangible for sales and use tax and investment credit purposes. Compare Chittenden Trust Co. v. King, 465 A.2d 1100 (Vt. 1983), with Bank of Vt. v. United States, 61 A.F.T.R.2d (RIA) 87-788, 88-1 USTC (CCH) para. 9169 (D. Vt. 1988), Ronnen v. Commissioner, 90 T.C. 74 (1988), and Northwest Corp. Subs. v. Commissioner, 108 T.C. 358 (1997).

The problem is that ADVO, unlike some printers or publishers, pursuant to ADVO's customer and/or printer contracts never sold, leased, rented, licensed, exchanged, or otherwise disposed of the prepress electronic file. ADVO instead elected to retain ownership thereof and used the file as a tool for the manufacturing and producing of the mailing packages advertising materials. Therefore, the electronic files themselves do not constitute or generate "domestic production gross receipts" for purpose of determining a sec. 199(a) deduction.

We also note that the deduction is limited by sec. 199(b) to 50% of the "W-2 wages of the taxpayer for the taxable year". There is no evidence in the record that ADVO's approximately 600 sales executives were employees whose

(continued...)

applies to U.S. corporations that manufacture products through agreements with contract manufactures. That subject is an issue of first impression in this Court.[11]

Respondent is in a real sense a stakeholder in this dispute. The printed advertising materials were manufactured and produced by someone in the United States, and that someone is entitled to the section 199 deduction to the extent they otherwise meet the requirements of that section. Here the question is whether ADVO or the contract printer is the appropriate recipient, as only one of them may

---

[10](...continued)
wages were reported on Forms W-2, Wage and Tax Statement, or perhaps commission-based sales persons whose compensation was reported on Forms 1099-MISC, Miscellaneous Income. The 40 to 45 graphic print coordinators, the 50 to 60 desktop artists, the numerous associates and temporary associates at each of the 17 mail processing facilities, and the 20 to 25 quality control artists may well have been Form W-2 employees. Because we do not find infra that they or ADVO actually produced any QPP, this has no effect on our holding. However, had this case come out the other way and had it been disputed, ADVO would have borne the burden of proving that its employees were Form W-2 employees. See sec. 199(b)(2).

[11]A somewhat similar problem involving Houdini, Inc., a producer of gift baskets consisting of food and alcoholic products produced by third parties and gift baskets and cardboard or Styrofoam void fillers also manufactured by third parties according to Houdini's specifications, was recently addressed in United States v. Dean, __ F. Supp. 2d __, 2013 WL 2255254 (C.D. Cal. May 7, 2013). We note that opinions of a U.S. District Court do not constitute binding precedent in this Court. Even so, we see no need to distinguish Dean given the factually specific nature of the benefits and burdens test discussed infra.

claim the credit as to each item sold. Sec. 199(d)(9);[12] sec. 1.199-3(f)(1), Income Tax Regs.[13] If ADVO is entitled to the deduction, a second question arises, namely the amount of domestic production gross receipts attributable to and derived from the lease, rental, license, sale, exchange, or other disposition of qualifying production property as opposed to income derived for providing

_____

[12]Sec. 199(d) was amended by the Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432, div. A, sec. 401(a), 120 Stat. at 2953, effective for tax years beginning after December 31, 2005, id. sec 401(b). This amendment inserted a new sec. 199(d)(8) and redesignated what had previously been sec. 199(d)(8) as sec. 199(d)(9). Id. sec. 401(a).

[13]The sec. 199 regulations apply for taxable years beginning on or after June 1, 2006. Sec. 1.199-8(i)(1), Income Tax Regs. For taxable years beginning on or before May 17, 2006, taxpayers may apply secs. 1.199-1 through 1.199-8, Income Tax Regs., provided they apply all provisions. Id. For taxables years beginning in between June 1, 2006, and May 17, 2006, taxpayers may apply secs. 1.199-1 through sec. 1.199-9, Income Tax Regs. Id. But a taxpayer whose taxable year began before June 1, 2006, may choose to rely on Notice 2005-14 (2005-1 C.B. 498) or the proposed regulations. Id.

services.[14]  Of course if ADVO is entitled to the deduction it may well be a larger

deduction than if the printer is the entitled party.

II.    DPGR

Section 199 allows the taxpayer a deduction computed by multiplying an

applicable percentage (3% here) by the lesser of the taxpayer's qualified

production activities income (QPAI) resulting from domestic production activities

or the taxpayer's taxable income.  Sec. 199(a).  QPAI is computed by determining

the taxpayer's DPGR and then reducing the DPGR by the cost of goods sold and

other expenses, deductions, and losses (computed without regard to the section

199 deduction) that are properly allocable to DPGR.  Sec. 199(c)(1).

Section 199(c)(4)(A) defines "domestic production gross receipts" which

are subject to certain enumerated exceptions in section 199(c)(4)(B) as

---

[14]ADVO claimed a deduction based on the DPGR derived from its direct mail advertising business.  Those receipts included inter alia:  payment for the production of the electronic computer file transmitted to the contract printer; review and monitoring of the printing, cutting, and folding process; operation of the shared mail processing facilities including the Muller 227s and Alphaliners to group the wrap and inserts into shared mail packages; and the selection of mail recipients using ADVO's proprietary demographic wrap zone and ATZ information.  Because some elements of this turnkey product such as sorting, packaging, and mailing may constitute a service rather than manufacturing or production, an allocation of receipts might be necessary.  However, as we have concluded ADVO did not have DPGR and is not entitled to a sec. 199 deduction, we need not address this issue here.  See generally H.R. Conf. Rept. No. 108-755, at 259 n.27 (2004), 2004 U.S.C.C.A.N. 1341, 1351.

the gross receipts of the taxpayer which are derived from--

>>> (i) any lease, rental, license, sale, exchange, or disposition of--

>>>> (I) qualifying production property [QPP] which was manufactured, produced, grown, or extracted [MPGE] by the taxpayer in whole or in significant part within the United States,

>>>> (II) any qualified film produced by the taxpayer, or

>>>> (III) electricity, natural gas, or potable water produced by the taxpayer in the United States,

>>> (ii) in the case of a taxpayer engaged in the active conduct of a construction trade or business, construction of real property performed in the United States by the taxpayer in the ordinary course of such trade or business, or

>>> (iii) in the case of a taxpayer engaged in the active conduct of an engineering or architectural services trade or business, engineering or architectural services performed in the United States by the taxpayer in the ordinary course of such trade or business with respect to the construction of real property in the United States.

DPGR includes gross receipts from QPP that was manufactured, produced, grown, or extracted (MPGE) in the United States. Sec. 199(c)(4)(A)(i); Longino v. Commissioner, T.C. Memo. 2013-80, at *63-*64.

In order to determine DPGR the taxpayer may use "any reasonable method that is satisfactory to the Secretary based on all of the facts and circumstances, [to determine] whether gross receipts qualify as DPGR on an item-by-item basis (and not, for example, on a division-by-division, product line-by-product line, or transaction-by-transaction basis)." Sec. 1.199-3(d)(1), Income Tax Regs. The regulations also state that "[t]he term item means the property offered by the taxpayer in the normal course of the taxpayer's business for lease, rental, license, sale, exchange, or other disposition". Sec. 1.199-3(d)(1)(i), Income Tax Regs. ADVO's broadly defined industry is direct mail advertising. ADVO specializes in coordinating the entire process from the initial design of the artwork to delivering the printed material to the targeted consumers. The primary product produced in this industry is the printed advertisements.

Section 199(c)(5) defines QPP as tangible personal property, any computer software, and any property described in section 168(f)(4) ("sound recordings"). Tangible personal property is any tangible property other than land, real property, computer software, sound recordings, qualified films, and electricity, natural gas, or potable water. Sec. 1.199-3(j)(2), Income Tax Regs.

III.   Manufactured

Congress did not define "manufacture" in the Code.  However, it did direct the Secretary to "prescribe such regulations as are necessary to carry out the purposes of this section".  Sec. 199(d)(9).  On December 21, 2005, Congress, as an aspect of the Gulf Opportunity Zone Act of 2005, Pub. L. No. 109-135, sec. 403(a)(13), 119 Stat. at 2619, directed the Secretary to "includ[e] regulations which prevent more than 1 taxpayer from being allowed a deduction under this section with respect to any activity described in subsection (c)(4)(A)(i)".

The Secretary in response promulgated section 1.199-3(e)(1), Income Tax Regs., which defines "manufactured, produced, grown, or extracted" (MPGE) to include "manufacturing, producing, growing, extracting, installing, developing, improving, and creating QPP; making QPP out of scrap, salvage, or junk material as well as from new or raw material by processing, manipulating, refining, or changing the form of an article, or by combining or assembling two or more articles".  The regulation further states that when the taxpayer contracts with an unrelated third party for the manufacturing of its products the taxpayer must have the "benefits and burdens of ownership of the QPP under Federal income tax principles during the period the MPGE activity occurs".  Sec. 1.199-3(e)(1), Income Tax Regs.  Neither party challenges the validity of the regulations nor that

the benefits and burdens standard should be applied in this case, and we note that "the Commissioner's regulatory efforts are generally entitled to the same Chevron standard as those of any other agency." Carpenter Family Invests., LLC v. Commissioner, 136 T.C. 373, 377 (2011) (citing Mayo Found. for Med. Educ. & Research v. United States, 562 U.S. ___, 131 S. Ct. 704 (2011)).

The initial interim guidance to taxpayers on section 199 released by the Treasury on January 19, 2005, explains that the benefits and burdens of ownership standard under Federal income tax principles "is based on the principles under § 936 and § 263A". Notice 2005-14, sec. 3.04(4), 2005-1 C.B. 498, 505. The final section 199 regulations do not specifically adopt the Code sections mentioned in the interim guidance for the benefits and burdens test, nor do they abandon the standard discussed in the interim guidance. See sec. 1.199-3(f)(1), Income Tax Regs. The only mention of the definition of "taxpayer" in the prologue to the final regulations explains that

> One commentator suggested a simplifying convention to determine which party to a contract manufacturing arrangement has the benefits and burdens of ownership under Federal income tax principles. The commentator requested that the final regulations permit unrelated parties to a contract manufacturing arrangement to designate, through a written and signed agreement between the parties, which of them shall be treated for purposes of section 199 as engaging in MPGE activities conducted pursuant to the arrangement. The final regulations do not adopt the commentator's suggestion.

The IRS and Treasury Department continue to believe that the benefits and burdens of ownership must be determined based on all of the facts and circumstances and a designation of benefits and burdens would not be appropriate.

T.D. 9263, 2006-1 C.B. 1063, 1068. But cf. infra note 17. This discussion is enlightening because it highlights the importance of the fact-specific benefits and burdens test for each individual situation.[15] Also, this discussion explicitly states

---

[15]The Court recognizes that sec. 199 is not the only Code section that, with respect to property, contains the phrase "manufactured, produced, grown, or extracted". Sec. 954(d), which defines the term "foreign base company sales income" for the purposes of sub. F inclusions, also contains the phrase, as do, for example, secs. 904(d)(2)(G), 971(e), and 993(c)(1)(A) and (d)(1)(C). The Treasury Department has previously issued regulations concerning sec. 954, including guidance on the manufacturing, producing, growing, or extracting language. Sec. 1.954-3(a)(4), Income Tax Regs. And we have had cause to interpret these and other relevant regulations and statutes over the years. See, e.g., Garnac Grain Co. v. Commissioner, 95 T.C. 7, 21 (1990) (sec. 993(d) and noting sec. 1.993-3(c)(2)(i), Income Tax Regs., which addressed contract manufacturing), supplemented by T.C. Memo. 1991-363; Webb Export Corp. v. Commissioner, 91 T.C. 131, 138 (1988) (sec. 993(c)); Dave Fischbein Mfg. Co. v. Commissioner, 59 T.C. 338, 354 (1972) (sec. 954(d)); Bausch & Lomb Inc. v. Commissioner, T.C. Memo. 1996-57 (sec. 954(d)). On the contract manufacturing issue, those regulations reach a different result from that reached with respect to the sec. 199 regulations although the statutory language is the same or similar.

In explanation of this apparent contradiction, when Treasury issued the sec. 199 regulations, the preamble specifically stated: "[C]ase law and other precedent under section 954 are not relevant for purposes of the substantial-in-nature requirement under section 199. Nor are they relevant for purposes of determining whether an activity is an MPGE activity under section 199." T.D. 9263, 2006-1 C.B. 1063, 1069. By adopting these regulations, Treasury clearly intended a different interpretation of these terms.

(continued...)

that the IRS and the Treasury Department "continue to believe" in the benefits and burden standard, implying that the original connection of the test to section 936 and 263A is still relevant.

The predecessor to section 936 was enacted to ease the burden of double taxation American companies faced when operating in U.S. possessions and to encourage American business to invest in the U.S. possessions. See Medchem (P.R.), Inc. v. Commissioner, 116 T.C. 308, 333 (2001), aff'd, 295 F.3d 118 (1st Cir. 2002). Section 936 allows a credit against Federal income taxes. It requires that the American company be in an "active conduct of a trade or business within a possession" in order to avail itself of the tax credit. Sec. 936(a)(1)(A)(i). While the test for an active conduct of a trade or business, including situations underlying a manufacturing contract, is different from the benefits and burdens

---

[15](...continued)
Further, in sec. 199, Congress specifically tasked the Secretary with promulgating regulations, which before Mayo Found. for Med. Educ. & Research v. United States, 562 U.S.___, 131 S. Ct. 704 (2011), would have been classified by tax specialists as legislative regulations, that "prevent more than 1 taxpayer from being allowed a deduction under * * * [sec. 199]". Sec. 199(d)(9). This same concern does not seem to be present in sec. 954, nor did Congress give the Secretary a similar instruction. In addition, Congress specifically intended to exclude from sec. 954 "cases where any significant amount of manufacturing, major assembling, or construction activity is carried on with respect to the product by the selling corporation." S. Rept. No. 87-1881, at 84 (1962), 1962-3 C.B. 703, 790. Again, no similar concern appears to have existed with respect to sec. 199.

test, it has similar relevant factors: "[A] taxpayer actively conducts a trade or business in a U.S. possession only if it participates regularly, continually, extensively, and actively in the management and operation of its profit-motivated activity in that possession." Medchem (P.R.), Inc. v. Commissioner, 116 T.C. at 336-337.

Section 263A requires the capitalization of expenses in relation to the production of tangible property. In general, a taxpayer is not considered to be producing the tangible property unless it is an owner of the property. Sec. 1.263A-2(a)(1)(ii), Income Tax Regs. The section 263A regulations define the owner "based on all of the facts and circumstances, including the various benefits and burdens of ownership vested with the taxpayer". A taxpayer may be considered an owner of property produced, even though the taxpayer does not have legal title to the property. Sec. 1.263A-2(a)(1)(ii)(A) and (B)(1), Income Tax Regs. As the Court of Appeals for the Ninth Circuit noted: "In addition, § 263A(g)(2) provides that '[t]he taxpayer shall be treated as producing any property produced for the taxpayer under a contract with the taxpayer'". Suzy's Zoo v. Commissioner, 273 F.3d at 878. But this is not necessarily so under section 199.

Note the similarity of the section 263A regulation discussed above to section 1.199-3(f)(1), Income Tax Regs., in which the section 199 test asks whether the taxpayer "has the benefits and burdens of ownership."  However, as the amici curiae point out, the section 263A owner test is arguably broader that the section 199 benefits and burdens test because the section 263A test asks whether the taxpayer is an owner of the property, while the section 199 test requires a finding that the taxpayer is the owner of the property and has "the benefits and burdens of ownership * * * during the period of the MPGE activity".  Secs. 1.263A-2(a)(1)(ii)(A), 1.199-3(e)(1), and (f)(1), Income Tax Regs.  Although this may seem like a distinction without a difference for reasons discussed infra, it stands to reason that there may be more than one owner of section 263A property (and more than one taxpayer may have the benefits and burdens of ownership), while only one taxpayer may have the benefits and burdens of ownership under section 199.[16]

---

[16]As discussed above, the policy motivating the enactment of sec. 199 was to encourage domestic manufacturing and create jobs in the United States.  Sec. 263A was enacted as part of the Tax Reform Act of 1986, Pub. L. No. 99-514, sec. 803(a), 100 Stat. at 2350, to address what was perceived as two significant problems concerning the expense/capital expenditure boundary:

> First, the existing rules may allow costs that are in reality costs of producing, acquiring, or carrying property to be deducted currently,
>
> (continued...)

A.    Benefits and Burdens

The intent of section 199 was to encourage domestic manufacturing, and it

was intended that only one taxpayer may claim the deduction for the product

manufactured.  In the event, as is the case here, where one taxpayer pursuant to a

---

[16](...continued)
rather than capitalized into the basis of the property and recovered
when the property is sold or as it is used by the taxpayer.  This
produces a mismatching of expenses and the related income and an
unwarranted deferral of taxes.  Second, different capitalization rules
may apply under present law depending on the nature of the property
and its intended use. These differences may create distortions in the
allocation of economic resources and the manner in which certain
economic activity is organized.  * * * [I]n order to more accurately
reflect income and make the income tax system more neutral, a single,
comprehensive set of rules should govern the capitalization of costs
of producing, acquiring, and holding property * * *.

S. Rept. No. 99-313, at 140 (1986), 1986-3 C.B. (Vol. 3) 1, 140; see also Robinson
Knife Mfg. Co. v. Commissioner, 600 F.3d 121, 126-127 (2d Cir. 2010), rev'g
T.C. Memo. 2009-9.  Therefore, Congress necessarily intended sec. 263A to have
a broad sweep in order to capture the costs of producing, acquiring, and carrying
of property, and courts, including this one, have interpreted this section broadly.
See Suzy's Zoo v. Commissioner, 273 F.3d 871, 879 (9th Cir. 2001), aff'g 114
T.C. 1 (2000); Reichel v. Commissioner, 112 T.C. 14, 18 (1999) (real estate taxes
had to be capitalized under sec. 263A as indirect costs of "producing" property
even though property was not developed); Von-Lusk v. Commissioner, 104 T.C.
207, 215 (1995) (costs of meeting with government officials, obtaining building
permits, and drafting architectural plans were development costs amounting to
"production" under sec. 263A); Carpenter v. Commissioner, T.C. Memo.
1994-289 (construction costs incurred by building contractor for an unsold home
had to be capitalized under sec. 263A because the home was "produced" by the
contractor).

contract performs a qualifying production activity with another taxpayer, "then only the taxpayer that has the benefits and burdens of ownership of the QPP * * * under Federal income tax principles during the period in which the qualifying activity occurs is treated as engaging in the qualifying activity."[17] Sec. 1.199-3(f)(1), Income Tax Regs.

ADVO directs the Court's attention to Suzy's Zoo v. Commissioner, 114 T.C. 1, a case whose facts seem, at first glance, to be very close to the case at hand. In that case this Court held that a corporation, which developed cartoon characters for its line of paper products and then contracted with independent

[17]The Commissioner now recognizes that in contract manufacturing relationships, each party, as in this case, will often have some of the benefits and burdens of ownership. Consequently the Commissioner, the taxpayer, and ultimately the courts may expend significant resources to determine which party may claim the deduction. I.R.S. LB&I Directive, LB&I-04-0713-006 (July 24, 2013). In recognition of the cost of such determinations, the Acting Commissioner of the IRS' Large Business and International Division has instructed his examiners not to challenge a taxpayer's claim to have the benefits and burdens for a sec. 199 deduction if that taxpayer provides a certification executed by both parties designating the party who is to receive the sec. 199 deduction. An acceptable form of certification is included as an exhibit to the guidance. That form included a counterpart: written certification that it did not claim the deduction for any taxable year governed by the contract. Id. While expressly stating that the guidance provided "is not an official pronouncement of law, and cannot be used, cited, or relied on as such", id., the Commissioner's policy, as long as it remains in effect, can resolve in advance cases like this one. It also highlights the factually intensive nature of the inquiry of determining to whom the benefits and burdens of ownership belong when both parties to a contract manufacturing relationship may potentially claim the sec. 199 deduction.

printing companies, was the "owner" of the paper products through production and until they were sold for the purposes of section 263A. Id. at 8. The printers in Suzy's Zoo would receive original drawings, photograph the drawings, create proofs, and then use their own ink and paper to print the products. Id. at 3.

Respondent argues that Suzy's Zoo, involving a section 263A dispute, is not determinative of the section 199 issue here. On November 4, 2005, the Treasury Department issued proposed rules that included a preamble stating:

> While sections 199, 263A, and 936 all have benefits and burdens standards, the standard under section 199 is not the same as those under sections 263A and 936. * * * The determination of whether a taxpayer is considered the owner is based on all of the facts and circumstances, including the various benefits and burdens of ownership vested with the taxpayer. Because the standard under the section 263A regulation is broad, it has been interpreted to allow two taxpayers to be considered the producer of the same property. Compare, for example Suzy's Zoo v. Comm'r, 114 T.C. 1 (2000), aff'd 273 F.3d 875 (9th Cir. 2001) and Golden Gate Litho v. Comm'r, T.C. Memo (1998-184).

Notice of Proposed Rulemaking and Notice of Public Hearing, 70 Fed. Reg. 67220, 67228 (Nov. 4, 2005).

We are aware that the Court has previously been unpersuaded by a preamble to regulations. See Allen v. Commissioner, 118 T.C. 1, 17 n.12 (2002) ( "In addition to the obvious fact that these documents also are not items of legislative history, these documents are afforded little weight in this Court." (citing Dobin v.

Commissioner, 73 T.C. 1121, 1127 n.9 (1980) ("Suffice it to say that we never have understood the preamble to proposed regulations to be precedential."))). We are not bound by the preamble, but because it is an agency's interpretation of its statute, we apply the standard enunciated by the Supreme Court in Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).[18] Therefore, respondent is entitled to at least the lowest level of deference in interpreting his own regulations and their statutes. See United States v. Mead Corp., 533 U.S. 218, 221 (2001).

---

[18]In United States v. Mead Corp., 533 U.S. 218, 221 (2001), the Supreme Court recognized that there are various types of agency pronouncements that may be entitled to different levels of deference and that the lowest level of deference, Skidmore deference, has continuing vitality. See id. at 234 ("Chevron did nothing to eliminate Skidmore's holding that an agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency" (quoting Skidmore v. Swift & Co., 323 U.S. 134, 139 (1944)); see also Taproot Admin. Servs., Inc. v. Commissioner, 133 T.C. 202, 208 n.15 (2009), aff'd 679 F.3d 1109 (9th Cir. 2012). The Supreme Court has established a two-prong test for determining whether to afford an agency pronouncement Chevron deference. Mead Corp., 533 U.S. at 226-227 ("We hold that administrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."); see also Marmolejo-Campos v. Holder, 558 F.3d 903, 908 (9th Cir. 2009); PSB Holdings, Inc. v. Commissioner, 129 T.C. 131, 142 (2007) (Commissioner's interpretation of a statute in a revenue ruling is entitled to some deference, i.e. "consideration by this Court"); William J. Wilkins, "Implications of Home Concrete", 31 ABA Sec. of Tax'n News Q., Summer 2012, at 25.

We noted supra that section 263A is an inclusive section and more than one taxpayer can be the owner of the property.  Section 199 is a section that allows a deduction.  Deductions and credits are a matter of legislative grace, and taxpayers must prove entitlement to the deductions and credits claimed.  Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); LaPoint v. Commissioner, 94 T.C. 733, 736-737 (1990).  Under section 199 the alleged manufacturer must establish that it is the only taxpayer who may be determined to be the owner of the property with the benefits and burdens of ownership.  Consequently we find that, although the factors used to determine ownership under section 263A are helpful in determining ownership under section 199, we are not bound in applying section 199 by the holding in Suzy's Zoo.[19]  We agree

_____

[19]In Suzy's Zoo v. Commissioner, 114 T.C. at 9-10, we noted that unlike the test in sec. 199 the test in sec. 263A does not focus specifically on who bore the benefits and burdens of ownership when the item was manufactured and/or produced.  Instead the Court stated:

>    Petitioner focuses on the fact that the printers bear the risk of loss during the printing process. We do not find this fact dispositive as to who owns (and thus produces) the paper products. The identification of the owner of property for purposes of the UNICAP rules does not necessarily rest on who bears the risk of loss when the product is fabricated or assembled, or, for that matter, on who actually turns the screws or hammers the nails into the product. The owner of property must be identified from the facts and circumstances of the case, see sec. 1.263A–2(a)(1)(ii), Income Tax Regs., and who

(continued...)

with respondent that Congress did not intend for section 199 to be broadly

inclusive in determining the owner of property.[20]

B.      Benefits and Burdens Test for Section 199

The examples in the section 199 regulations shed some light on the factors

that the IRS and Treasury find relevant in determining which taxpayer had the

---

[19](...continued)
bears the risk of loss is merely one factor to consider. * * *

For whatever reason Treasury created two distinctly different tests for sec. 263A purposes and sec. 199 purposes. While this is complicating and not totally consistent with legislative history and Treasury's interim guidance, which as previously noted, provides that sec. 199 "is based on the principals of §936 and §263A", we do not conclude it is invalid. As alluded to supra, neither party challenges the regulations and in the light of Mayo Found., 562 U.S. ___, 131 S. Ct. 704, we agree.

[20]The amici curiae note at 23 of their brief that the Court found as a factual matter in Suzy's Zoo v. Commissioner, 114 T.C. at 8, that the taxpayer was the "only 'owner'" of the greeting cards under sec. 263A. Although the sec. 263A test and the sec. 199 test are very similar, each test is very fact specific and the result in one case is not necessarily dispositive in another similar but factually different case. The amici contend that "the party that engages the printer and the printer can [both] be 'producers'" but that this does not mean there can be two owners. The Court of Appeals for the Ninth Circuit, in affirming Suzy's Zoo, explained: "Although the printers use their own supply of paper in producing the greeting cards and [during the printing, manufacture, and production] bear the risk of loss until shipment [of the printed product], Suzy's Zoo is the owner of the cards from the beginning stage of production due to the degree of control it exercises over the manufacturing process. Therefore, Suzy's Zoo is a 'producer' under § 263A." Suzy's Zoo v. Commissioner, 273 F.3d at 880 (emphasis added). In this case we have concluded as a factual matter that the degree of manufacturing control was not equivalent to that in Suzy's Zoo and that ADVO was not the only owner.

benefits and burdens of ownership during manufacture and/or production. Of particular interest to this case is Example (1) of section 1.199-3(f)(4), Income Tax Regs. In this example X designs machines and contracts with Y, an unrelated person, to manufacture the machines. X owns the intellectual property attributable to the design, and Y is allowed to use that property only to manufacture X's machines. Y has no right to independently exploit the intellectual property. Y controls the details of the manufacturing process, bears the risk of loss or damage during manufacturing, has legal title to the machines during manufacturing, and enjoys the economic gain or bears the loss from the sale of the machines measured by the difference between Y's costs and the fixed contract price. On these facts, Example (1) explains that Y had the benefits and burdens of ownership during production.

Caselaw has also developed factors for the benefits and burdens of ownership test with respect to other sections of the Code. The parties each cite and discuss the factors of Grodt & McKay Realty, Inc., v. Commissioner, 77 T.C. at 1221, and we find these factors plus the section 936 test are useful in determining whether ADVO had the benefits and burdens of the printed advertisements while they were being printed.

The factors we use to determine the benefits and burdens of ownership under section 199 for the purposes of this case are: (1) whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity interest was acquired; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser and which party has control of the property or process; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; (8) which party receives the profits from the operation and sale of the property; and (9) whether ADVO actively and extensively participated in the management and operations of the activity. Id.; see also sec. 936; Hutchinson v. Commissioner, 116 T.C. 172 (2001).[21]

_____

[21]These are not the only factors that may be considered in the benefits and burdens test, which is fact intensive. For examples of other factors that the IRS has indicated may be relevant in determining which party had the benefits and burdens of ownership, see the "Guidance for Examiners on I.R.C. § 199 Benefits and Burdens of Ownership Analysis in Contract Manufacturing Arrangements" released on February 1, 2012, by the Large Business and International Division. I.R.S. LB&I Directive, LB&I-4-0112-001 (Feb. 1, 2012). Many of the factors focused on by the guidance are addressed in this opinion. We mention these factors not to suggest that this guidance is persuasive or controlling, but rather to illustrate how the factors we use are not exclusive. In this particular case, they are sufficient for us to determine the benefits and burdens of ownership.

(continued...)

As discussed supra, both the prologue to the proposed regulations and the prologue to the final regulations explain that the benefits and burdens during manufacture and/or production standard is based on all of the facts and circumstances of each particular case. We agree and also note that no one factor is determinative.

C.     Application of the Benefits and Burdens Test

1.     Legal Title

According to Commissioner v. Segall, 114 F.2d 706, 709 (6th Cir. 1940), rev'g and remanding 38 B.T.A. 43 (1938), "Passage of title is perhaps the most conclusive circumstance" in determining the owner of the property for Federal taxation purposes. See also Harmston v. Commissioner, 61 T.C. 216, 228 (1973)

---

[21](...continued)

The guidance focuses on three areas. It first looks to the terms of the contract: (1) did the taxpayer have title to the work in process; (2) did the taxpayer have risk of loss over the work in process; and (3) was the taxpayer primarily responsible for insuring the work in process? Then it looks to the production activities: (1) did the taxpayer develop the qualifying activity process; (2) did the taxpayer exercise oversight and direction over the employees engaged in the qualifying activity; (3) did the taxpayer conduct more than 50% of the quality control tests while the qualifying activity was occurring? And finally, the guidance looks to the economic risks: (1) was the taxpayer primarily liable under the "make-good" provisions of the contract; (2) did the taxpayer provide more than 50%, based on cost, of the raw materials and components used to produce the property; (3) did the taxpayer have the greater opportunity for profit increase or decrease from production efficiencies and fluctuations in the cost of labor and factory overhead?

("passage of title * * * in deciding when 'ownership' has passed * * * is certainly an important consideration"), aff'd, 528 F.2d 55 (9th Cir. 1976). We also note that Example (1) discusses and concludes that Y, the party which had the benefits and burdens, had legal title to the property while it was in production. Sec. 1.199-3(f)(4), Income Tax Regs. While we recognize that title to the intangible property (i.e. the actual design of the art as transmitted on the PDF file) never transferred to the printers or to ADVO's clients, ADVO's printing agreements with its contract printers clearly state that "Title to and risk of loss" of the product (i.e. the printed material) does not transfer to ADVO until the products have left the printers' facilities. This factor weighs in favor of respondent.

### 2. Intention of the Parties

We are less concerned with the label that the parties give the transaction; we look to what the parties actually intended to happen. Oesterreich v. Commissioner, 226 F.2d 798, 801-802 (9th Cir. 1955).

ADVO asserts that the parties' intention is demonstrated by the section of the printing agreement entitled "Governing Law", which in relevant part states: "The parties hereto agree that, although this Agreement is for printing services and not "goods", the Uniform Commercial Code * * * shall be applicable". ADVO believes that this term establishes that the parties believed that they were

contracting with the third party printers for services, not for the manufacturing of a product. Respondent contends that the contracts explicitly state that "ADVO will pay * * * [printer] for its manufacturing services" which shows that the parties intended that the printers were the manufacturers.

At trial Thomas McCloskey, the chief executive officer and one of the principal owners of Doodad, one of ADVO's contract printers, testified that Doodad claimed a deduction under section 199 for the income attributable to producing ADVO's advertising material. Implicitly, this printer obviously intended that it qualify as the manufacturer of the advertising material for purposes of claiming the section 199 deduction.

The parties contemplated and agreed that the third-party printers would print the specific advertising material that ADVO required and then send the printed material to ADVO. It was always their intent that the printers produce the actual tangible paper materials using the ADVO intangible pre-press materials. Therefore we find this factor weighs in favor of respondent.

### 3 & 4. Equity Interest & Present Obligation

While these factors were relevant in Grodt & McKay in determining whether the transactions were bona fide sales and they may prove relevant in future section 199 benefits and burdens tests, they are not significantly relevant to

determining whether ADVO had the benefits and burdens of ownership while the advertising material were printed by the third-party printers. Thus, this factor is neutral.

## 5. Right of Possession & Control

In determining whether ADVO had the benefits and burdens of ownership of the advertising material during the printing process, "[t]ransfer of possession is also significant." Commissioner v. Segall, 114 F.2d at 709. The third-party printers necessarily had the right of possession during the printing process. It was the printers who produced the hard copies of the advertising material, and ADVO did not have the right of possession until the printed material was delivered to it.

However, because we are tailoring the factors from Grodt into the context of section 199, the analysis cannot merely end with the party that has the right of possession. The parties spent an extensive amount of time discussing each step of the printing process, with each trying to prove whether ADVO or the third-party printers were in control of the process. See sec. 1.199-3(f)(4), Example (1), Income Tax Regs.

ADVO contends that it was ultimately in control of the printing process. ADVO asserts that its PDF documents essentially set the color keys for the printer; that their paper contracts determined which paper the printers were allowed to use;

and that the printing agreements specify exactly which machines the printers where allowed to use, that the printers could not gang other parties' work with their's, and at which locations they were allowed to print ADVO's materials.[22]  On the other hand, the third party printers owned or leased and operated the machinery, sometimes purchasing it at the behest of ADVO, but it was always the printers' property.  The third-party printers and their employees set up the machines, loaded the paper, fine-tuned the color keys, ran the printing process, supervised the quality, and then delivered the advertising materials to ADVO.

Respondent contends in the interim guidance that a taxpayer who is contracting the printing services out to a third party must have the benefits and

[22]On March 29, 2013, the Office of Chief Counsel released a memorandum in which it addressed a fact pattern similar to the one at issue in this case. See C.C.A. 201313020 (Mar. 29, 2013).  In the memo the taxpayer published books using third-party printers.  Although such a memorandum reflects only the opinion of one of the parties and is in no way controlling on this Court, we find the agency's interpretation of its own regulations enlightening.  Specifically the memo states:

> Our Office believes that print specification activities are non-MPGE activities.  While providing the print specifications to the contract manufacturer gives the contract manufacturer a detailed description of how the Taxpayer desires the mass-produced books to look (e.g., size, color, print type, etc.), the print specifications do not produce QPP.

Although the memo did not address the benefits and burdens test, we have concluded independently for the reasons discussed above that print specifications do not produce QPP.

burdens of ownership to qualify for the section 199 deduction and that this test "applies even if the customer exercises direct supervision and control over the activities of the contractor". Notice 2005-14, 3.04(4). We do not find that, in practice, ADVO exercised day-to-day control over the activities of the printer. This factor weighs in favor of respondent.

6.     Property Taxes

There is no evidence in the record that ADVO or anyone else paid property taxes on any of the pre-press PDF files or the printed property during the manufacturing process. We find that this factor is neutral.

7.     Risk of Loss or Damage

Along with the benefits of ownership must go the burdens. Harmston v. Commissioner, 61 T.C. at 230. In the instant case, this factor requires us to determine which party bore the risk of loss or damage to the advertising material during its production while it was at or in the possession of the third-party printers. See sec. 1.199-3(f)(4), Income Tax Regs. (Example (1) discusses risk of loss or damage during the manufacturing process as an important factor in the benefits and burdens test).

As noted supra, the risk of loss or damage did not transfer to ADVO until the advertising materials had either left the printers' facilities or been delivered to

ADVO. ADVO also did not assume any risk with respect to the directed buy paper supply agreements. Although ADVO required its printers to purchase the paper from a specific source, ADVO did not guarantee payments to the broker in the event the printers defaulted on the payments nor did ADVO reimburse the printer for the paper costs until the printed product had been completed and shipped per ADVO's specifications. The third-party printers were also required to maintain insurance with respect to all of ADVO's work in progress and all materials. Given the insurance and the fact that the risk of loss did not transfer to ADVO until after completion of the manufacturing process, ADVO did not have the burden of the risk of loss or damage with respect to the advertising materials.

The regulations also suggest that the type of contract plays a role in determining risk of loss and is one of the facts and circumstances in determining who has the benefits and burdens. Id. The examples imply a difference between fixed cost contracts and reimbursable cost type contracts. Sec. 1.199-3(f)(4), Examples (1) and (2), Income Tax Regs. Thus, the fact that the manufacturing taxpayer may bear a greater risk of loss in a fixed cost contract as opposed to a reimbursable contract is significant. One version of ADVO's contracts bore elements of a reimbursable contract, such as agreements to allow price adjustments for increases in freight rates and ink prices and increases tied to the Consumer

Price Index. The other contracts kept costs firm but included terms implying that if sufficiently documented, some price changes, for example to reflect new printing developments in the graphic arts, might be allowed or even required.

Furthermore, we realize that in the event damage or loss of the advertising material resulted in the material's not getting timely delivered to the end consumers, ADVO bore the economic risk vis-a-vis its clients. ADVO's contracts with clients often required quick turnaround periods. If the printer does not print an acceptable product in that short amount of time, ADVO certainly suffers economic harm. This harm is both quantifiable, in terms of its contract price with its clients, and more ethereal, in terms of reputation damage. In the light of these considerations, we find that this factor to be neutral.

8.      Profits From Operation and Sale

Similar to the example in section 1.199-3(f)(4), Income Tax Regs., the third-party printing companies enjoyed the economic gain or bore the loss from the sale of the advertising material according to the difference between the printing companies' costs and, as to some of the contracts, the fixed contract price. Therefore we find that this factor weighs in favor of respondent.

9.     Active and Extensive Participation

The test under section 936 asks whether ADVO actively and extensively participated in the management and operations of the activity.  Medchem (P.R.), Inc. v. Commissioner, 116 T.C. at 336-337.  As discussed under "Possession and Control", see supra p. 47, ADVO argues that it actively and extensively participated in the management and operation of the printing of the advertising material.  However, we find that it did not extensively participate in the operation of the printing presses or in the cutting or folding processes, and thus this factor weighs in favor of respondent.  ADVO did extensively participate in the mailing and dissemination of the advertising materials (i.e. the solo or cooperative mail packages), but that function is a service, not QPP.  Sec. 1.199-3(e)(1) and (2), Income Tax Regs.

10.     Conclusion

After careful review of all of the aforementioned factors in the light of the specific facts and circumstances of this case, we find that ADVO did not have the benefits and burdens of ownership while the advertising material was printed.[23]

---

[23]On brief petitioner also argued that its gross receipts with respect to graphic design, processing, and distribution activities were also DPGR.  Because we did not find that petitioner had the benefits and burdens of ownership during the manufacturing activity, we need not address these issues.

Therefore, ADVO did not have "the benefits and burdens of ownership of the QPP under Federal income tax principles during the period of MPGE activity". Sec. 1.199-3(e)(1), Income Tax Regs. The gross receipts from the printing activity, therefore, are not DPGR. See id. As a result, ADVO is not entitled to the claimed section 199 deduction for its 2006 taxable year and its 2007 short taxable year.

The Court has considered all of petitioner's contentions, arguments, requests, and statements. To the extent not discussed herein, the Court concludes that they are meritless, moot, or irrelevant.

To reflect the foregoing,

An appropriate order

will be issued.